UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| CARLTON B. PARKS, ) | |
| ) | Case No. 1:19-cv-349 |
| *Plaintiff*, ) | |
| ) | Judge Travis R. McDonough |
| v. ) | |
| ) | Magistrate Judge Christopher H. Steger |
| JEFFREY LYASH, as President and CEO ) | |
| of the Tennessee Valley Authority, JOHN ) | |
| TERRY, in his individual and official ) | |
| capacities, EDWARD SPOONE, in his ) | |
| individual and official capacities, KRISTI ) | |
| FOXX, in her individual and official ) | |
| capacities, and JAMIE LYNCH, in her ) | |
| individual and official capacities, ) | |
| ) | |
| *Defendants*. ) | |

## MEMORANDUM OPINION

Before the Court are Defendants' motion for summary judgment (Doc. 125), Plaintiff's motion to alter this Court's order on Defendants' motion for judgment on the pleadings (Doc. 106), Plaintiff's motion to file a second amended complaint (Doc. 111), Plaintiff's objection to the magistrate judge's order on Defendants' motion to quash (Doc. 115), Plaintiff's motions in limine (Docs. 131, 148), Defendants' motion in limine (Doc. 150), Plaintiff's motion for sanctions (Doc. 133), Defendants' motion to strike Plaintiff's supplemental response and reply to response to motion for summary judgment (Doc. 143), Defendants' motion to strike jury demand (Doc. 152), and Plaintiff's motion for leave to include additional witnesses for trial (Doc. 156).

The Court will **DENY** Plaintiff's motion to alter the order on Defendants' motion for judgment on the pleadings (Doc. 106). The Court will **DENY** Plaintiff's motion to file a second amended complaint (Doc. 111) as **FUTILE**. The Court will **OVERRULE** Plaintiff's objection

to the magistrate judge's order on Defendants' motion to quash (Doc. 115). The Court will **DENY** as **MOOT** Plaintiff's motions in limine (Docs. 131, 148) and Defendants' motion in limine (Doc. 150). The Court will **DENY** Plaintiff's motion for sanctions (Doc. 133). The Court will also **GRANT** Defendants' motion to strike (Doc. 143) because Plaintiff failed to obtain the Court's prior approval to submit a supplemental brief, and the supplement brief does not call to the Court's attention developments occurring after Plaintiff filed a final brief. *See* E.D. Tenn. L.R. 7.1(d). The Court will **DENY** as **MOOT** Defendants' motion to strike jury demand (Doc. 152). The Court will **DENY** as **MOOT** Plaintiff's motion for leave to include additional witnesses for trial (Doc. 156). Finally, the Court will **GRANT** Defendants' motion for summary judgment (Doc. 125).

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Background

#### *i. Parks's Employment with Murray Guard*

Murray Guard, which is not a party to this lawsuit, provides security services to the Tennessee Valley Authority ("TVA") and other customers. (Doc. 124-1, at 24–25.) On October 24, 2013, Murray Guard hired Plaintiff Carlton B. Parks, an African-American male over forty years old, to work as a security officer. (Doc. 124-2, at 29–34.) There was no employment agreement. (*Id.* at 20–22.) As part of the application process, Parks identified his previous employers and disclosed why he left previous jobs. (*See* Doc. 124-1, at 75–78.) His history with two employers, the City of Chattanooga and Walden Security, is at issue in this case.

In his Murray Guard employment application, Parks stated that the Chattanooga Police Department ("CPD") wrongfully terminated him and that his termination was ultimately overturned. (Doc. 124-2, at 34.) In 1998, CPD terminated Parks as an officer after he was

indicted for sexual assault. (Doc. 124-1, at 76–78.) This charge, however, was dismissed in 2001. (Doc. 130-1, at 7–12; Doc. 130-2, at 1–5.) While the Tennessee Unemployment Appeals Tribunal determined Parks was entitled to collect unemployment because he was not fired for work-related misconduct, its decision did not deem CPD's termination "wrongful" or "overturn" that termination. (Doc. 130-1, at 5–6.) Following his termination from CPD, Parks sued the City of Chattanooga for racial discrimination under Title VII and for unlawful retaliation under Title VII and the First Amendment to the United States Constitution. (Doc. 124-2, at 40–51.) The district court granted summary judgment against Parks in that case, and the United States Court of Appeals for the Sixth Circuit affirmed that decision on appeal. *See Parks v. City of Chattanooga*, 74 F. App'x. 432 (6th Cir. 2003).

Parks also asserted in his Murray Guard employment application that he left his job at Walden Security due to unprofessional management. (Doc. 124-2, at 31.) Walden Security's records indicate, however, that the company terminated Parks for sleeping on the job. (Doc. 124-1, at 79; Doc. 124-4, at 189–90.)

Parks began working as a security officer with Murray Guard in January 2014, first at the TVA's Racoon Mountain facility. (*Id.*, at 29, 65–66, 122; Doc. 124-2, at 12.) TVA required Murray Guard employees, as well as all other contractors, to pass a background check and to complete training. (Doc. 124-1, at 20, 34.) Before Parks began, TVA completed his background check and training. (*Id.* at 40; Doc. 124-7, at 39–44.) The background check revealed Parks was arrested in 2007 for public indecency at the TVA Chickamauga Reservation Beach Parking Lot. (Doc. 124-5, at 54–56; Doc. 130, at 31.) Despite this arrest, TVA approved Parks to work at Raccoon Mountain. (Doc. 124-5, at 3.)

In April 2014, Murray assigned Parks to another TVA site, the Widows Creek Fossil Plant. (*Id.* at 68, 112; Doc. 124-2, at 13.) While Parks was working at the Widows Creek Fossil Plant, Murray Guard posted a position for a site supervisor at TVA's Chattanooga Office Complex. (Doc. 124-3, at 19–20.) This position required an additional sensitive security clearance. (Doc. 124-1, at 27–30.) Parks emailed John Terry, TVA's Supervisor of TVA Police Training and Contract Security Service Manager, seeking the required sensitive security clearance. (Doc. 124-5, at 51–53.) Terry then contacted Murray Guard's TVA account manager, Joe Parnell, regarding this request because Murray Guard was responsible for submitting requests for sensitive security clearance. (Doc. 124-1, at 27, 30; Doc. 125-5, at 51–53.) Parnell stated Murray Guard would handle the request and would communicate with Parks. (Doc. 124-1, at 27–30.)

On June 2, 2014, Parks contacted Parnell and Michael Cushenberry, Parks's branch manager at Murray Guard. (Doc. 124-1, at 51–52, 72; Doc. 124-7, 1–2.) He asked them to investigate two conversations he had with Al Shiflett, his Murray Guard weekend supervisor. (*Id.*) According to Parks's complaint to Murray Guard supervisors, Shiflett espoused several racist views in these conversations, including that: "Kings of Africa sold Black people into slavery and that Black people were not forced into slavery by White People"; that he agreed with prior beating and lynching of African Americans because that "was God's will"; and that "it was alright for Blacks to sit in the back of the bus." (Doc. 122-2, at 143–44.) Parks then met with employees at the Murray Guard offices about his complaint. (Doc. 124-1, at 52.) Murray Guard suspended Shiflett for three days without pay and changed Shiflett's shift so that he no longer worked with Parks. (Doc. 124-8, at 90–91, 104–05.)

4

On September 3, 2014, Terry's supervisor instructed him to process Parks's sensitive security clearance. (*Id.* at 30.) Terry met with three other TVA employees, Leon Spoone, Jamie Lynch, and Kristi Foxx, to discuss the request. (*Id.* at 30, 35.) While processing the request, the employees reviewed the arrest report detailing Parks's 2007 incident at Chickamauga Reservation. (*Id.* at 36; Doc. 124-3, at 37–40.) The report stated that Parks told the arresting officer he had previously worked for CPD and that he should not be prosecuted for his actions as a "professional courtesy." (Doc. 124-3, at 37.) The public-indecency charge relating to this arrest was expunged by a Tennessee state court on December 17, 2008. (Doc. 122-2, at 131.) The TVA team reviewing the sensitive security clearance request also reviewed Parks's application to Murray Guard and concluded Parks lied about his termination from CPD. (Doc. 124-1, at 36; Doc. 124-2, at 34.) Leon Spoone determined not to assign Parks to a TVA site due to lack of trustworthiness. (Doc. 124-1, at 30–31; Doc. 124-6, at 5–6.) TVA decided Parks would not be allowed to work at any TVA site, basing this decision on the circumstances of Parks's 2007 arrest and job application at Murray Guard. (Doc. 124-5, at 50.)

According to TVA, a decision was made around this time, to reduce the number of hours Murray Guard security officers worked due to budget constraints. (Doc. 124-1, at 29; Doc. 124-3, at 49–52.) As a result, on October 3, 2014, Murray Guard terminated Parks, stating the termination was based on the need to comply with the reduction of work for TVA and the seniority of other Murray Guard employees. (Doc. 124-1, at 31.)

   ii.  *Murray Guard's Relationship with TVA*

TVA states it uses two types of contractors: staff-augmentation contractors and managed-task contractors. (Doc. 124-3, at 15–17.) "Staff augmentation contractors" are under the supervision of a TVA employee. (*Id.* at 17.) "Managed task contractors" are managed by the

supplier providing services to TVA. (*Id.* at 16.) TVA classifies Murray Guard employees as managed-task contractors. (Doc. 124-1, at 24–25.) Murray Guard had security officers at nineteen TVA sites and employed a supervisor at each site who supervised the security officers and handled disciplinary action. (*Id.* at 27.)

Under the contract between TVA and Murray Guard, Murray Guard "provide[d] qualified security services at various TVA Non-Nuclear Facilities" and was "solely responsible for providing everything necessary to perform the Work." (*Id.* at 5, 8.) In furtherance of this contractual duty, Murray Guard was responsible for hiring, disciplining, and firing its security officers; supervising and managing the security officers; and scheduling the officers, directing their day-to-day activities, and paying them. (*Id.* at 25, 26–27, 29, 33.) Murray Guard also provided their security officers with uniforms. (Doc. 124-2, at 20, 26.)

Additionally, pursuant to their contract with TVA, Murray Guard was responsible for creating weekly reports for TVA. (Doc. 124-5, at 17.) These reports included "schedule update[s], safety report[s], and employee hours and/or headcount." (*Id.*) Parks, however, asserts that TVA and Murray Guard met to recruit, hire, train, place, supervise, manage, discipline, and terminate employment. (Doc. 134, at 3.)

### iii. The Instant Litigation

Parks filed this action against TVA, as well as individually-named TVA employees Jeffrey Lyash, John Terry, Kristi Foxx, and Jamie Lynch, on December 6, 2019. (Doc. 1.) In his initial complaint, Parks asserted claims for: (1) discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (2) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; (3) discrimination under 42 U.S.C. § 1981; (4) breach of contract; (5) interference with

prospective employment relationship; (6) tortious interference with employment contract; (7) unlawful inducement of breach of contract and tortious interference with business relationship in violation of Tennessee Code Annotated § 47-50-103; and (8) and civil conspiracy. (Doc. 17.) This Court granted the individual Defendants' motion to dismiss Parks's Title VII and ADEA claims (Doc. 34, at 2) and granted Defendants' motion for judgment on the pleadings with respect to Parks's state-law tort claims. (Doc. 100, at 11.)

As a result, only the following claims remain pending: (1) Parks's claims against TVA for discrimination, retaliation, and hostile work environment under Title VII; (2) Parks's claim against TVA for age discrimination under the ADEA; (3) Parks's claim against all defendants for discrimination under 42 U.S.C. § 1981; and (4) Parks's claim against all defendants for breach of contract. (*See* Doc. 34, at 2; Doc. 100, at 11.) Defendants moved for summary judgment on all remaining claims (Doc. 125) and their motion is ripe for the Court's review.

### B. Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out

7
Case 1:19-cv-00349-TRM-CHS   Document 158   Filed 09/14/22   Page 7 of 17   PageID #: 4112

the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

### C. Analysis

#### i. *Whether Title VII and the ADEA Apply*

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, and national origin. 42 U.S.C. § 2000(a). Title VII protections are limited to an "employee." 42 U.S.C. § 2000e(f). The ADEA prohibits employment discrimination based on age. 29 U.S.C. § 623. Like Title VII, the ADEA protections are limited to an "employee." *Id.* § 630(f). Therefore, before discussing the merits of Parks's claims, the Court must decide whether Parks is an "employee" of TVA under Title VII and the ADEA. *See* 42 U.S.C. § 2000(f); *id.*

Both Title VII and the ADEA define an "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f); 29 U.S.C. § 630(f). Title VII defines an "employer" as "a

8

Case 1:19-cv-00349-TRM-CHS   Document 158   Filed 09/14/22   Page 8 of 17   PageID #: 4113

person engaged in an industry affecting commerce who has fifteen[1] or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b).

Because Parks worked for Murray Guard, who in turn provided security services for TVA, Parks was not directly employed by TVA. (Doc. 124-2, at 29–34.) In such situations, the Sixth Circuit has applied two tests to determine whether an employment relationship nonetheless exists. *See Weary v. Cochran*, 377 F.3d 522, 524 (6th Cir. 2004); *Nethery v. Quality Care Invs., L.P.*, 814 Fed. App'x. 97, 102–03 (6th. Cir. 2020). The first test is the common-law agency test; the second is the joint-employer test. *Weary*, 377 F.3d at 524; *Nethery*, 814 Fed. App'x. at 102–03. The Court will apply the joint-employer test, because the Sixth Circuit appears to favor it in analyzing employment disputes.[2] *See Nethery*, 814 Fed. App'x. at 102–03; *Goforth v. TVA*, No. 20-cv-254, 2022 WL 1198213, at *7 n.4 (E.D. Tenn. Feb. 7, 2022).

The joint-employer theory allows "an entity that is not plaintiff's formal employer [to] be treated. . . as if it were the employer for purposes of employment laws. . . ." *Nethery*, 814 F. App'x. at 102–03 (quoting *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011)). "Entities are joint employers if they 'share or co-determine those matters governing essential terms and conditions of employment.'" *Id.* at 103 (quoting *EEOC. v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013)). "In determining whether an

---

[1] The only difference between Title VII and the ADEA's definitions of "employer" is that the ADEA requires twenty employees instead of fifteen. 29 U.S.C. § 630(b). This distinction is not at issue in this case, as it is undisputed TVA has more than twenty employees.

[2] The common-law agency test relies upon a list of ten non-exhaustive factors from the Restatement (Second) of Agency. *Weary*, 377 F.3d at 524 (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S, 318, 323–24 (1992)). The Court has weighed these factors and finds the outcome of Defendants' motion for summary judgment would be the common-law agency test. *See id.*

entity is the plaintiff's joint employer, the major factors include the 'entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance.'" *Id.* (quoting *Skanska*, 550 F. App'x at 256); *see N.L.R.B. v. Centra, Inc.*, 954 F.2d 366, 371 n.2 (6th Cir. 1992) (identifying factors including "supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, [and] issuance of operating instructions") (quoting *W.W. Grainger, Inc. v. N.L.R.B.*, 860 F.2d 244, 247 (7th Cir. 1988)).

The undisputed evidence in this case leaves no room for a reasonable jury to find TVA was Parks's joint employer. *Nethery*, 814 F. App'x. at 103. TVA did not hire Parks. (Doc. 124-1, at 22–23, 25–27; Doc. 124-2, at 29–34.) It did not have the power to terminate Parks's employment. (Doc. 124-1, at 24–27.) It had no control over Parks's day-to-day activities. (*Id.* at 29, 33.) It did not supervise his performance or set his schedule and assignments and did not pay Parks, withhold taxes, or provide other benefits.[3] (*Id.* at 22–23; Doc. 124-2, at 36; Doc. 124-3, at 8; Doc. 124-8, at 75–76.) Murray Guard employed supervisors at TVA sites to supervise and discipline its employees. (Doc. 124-1, at 27.) Murray Guard supervisors set Parks's shifts. (Doc. 124-2, at 36.) Murray Guard terminated Parks's employment. (Doc. 124-1, at 60–61.) Parks has not presented evidence resulting in a genuine issue of material fact as to these factors.

---

[3] The greatest aspect of control TVA exercised over Parks was the ability to deny him access to its facilities. (Doc. 124-1, at 27–30, 34.) It is not in dispute TVA decided which Murray Guard employees could be assigned to a TVA facility. (*Id.*; Doc. 134, at 4–6.) Parks states John Terry limited Parks's employment opportunities because of his 2007 arrest citation. (Doc. 134, at 4.) While TVA could prevent Parks from working in its facilities, TVA lacked the ability to terminate Parks's employment with Murray Guard and therefore did not have the level of control needed to be a joint-employer. (*Id.*; Doc. 124-8, at 20); *see also Sims v. EQT Corp.*, No. 13-1235, 2014 WL 4384593 (E.D. Pa. Sep. 4, 2014) ("[H]aving the authority to remove an employee from the property is not the equivalent of terminating their employment; nor does it evidence the necessary control over the employee to establish joint employer status.").

*See Celotex*, 477 U.S. at 325; *Chao*, 285 F.3d at 424. Instead, Parks's briefing merely questions whether TVA was actually exercising control of his firing through Murray Guard. (Doc. 134, at 4–6.)

Parks also contends Terry lied about TVA hiring decisions in his deposition. (Doc. 134, at 4.) In his deposition,n Terry stated: "I do not hire, I do not make selection for anything to do with Murray Guard personnel, their supervisors or their personnel. That decision is solely on-under Murray Guard." (Doc. 124-1, at 28.) Despite this, Parks asserts that Terry was the decision maker concerning who filled the Chattanooga Office Complex Position. (Doc. 134, at 4.) But Parks cites no evidence in support of this assertion.[4] (*Id.*)

The undisputed evidence demonstrates that TVA was not Parks's joint employer. *See Nethery*, 814 F. App'x. at 102–03. Therefore, TVA cannot be liable to Parks under Title VII or the ADEA. *See* 42 U.S.C. § 2000e(f); 29 U.S.C. § 630(f). Accordingly, the Court will **GRANT** Defendants' motion for summary judgment (Doc. 125) on Parks's claims under Title VII and the ADEA.

    ii.    *Title VII Claims and ADEA Claims on Merits*

Even if TVA were Parks's employer, his claims under Title VII and the ADEA still fail.

    a.    Discrimination and Retaliation

To show discrimination, a plaintiff can present either direct or circumstantial evidence of discrimination based on membership in a protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir.

---

[4] Parks makes several similar conclusory assertions in his briefing without citing specific facts supported by evidence in the record. Parks states Defendants held a meeting to have him terminated; he states Defendant Spoone was successful in having him terminated; and he states TVA instructed Murray Guard to terminate him. (Doc. 134, at 4–6.) None of these assertions is supported by the record.

2020). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action." *Peeples v. City of Detroit*, 891 F.3d 622, 633 (citing *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). Because Parks presents no such direct evidence of discrimination based on either race or age, the *McDonnell Douglas* framework applies. *See id.*

The *McDonnell Douglas* framework proceeds in three steps: (1) the plaintiff must first establish a prima facie case of discrimination; (2) the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action; and (3) the burden then returns to the plaintiff to show the defendant's offered reason is pretextual. *George*, 966 F.3d at 558 (citing *McDonnell Douglas*, 411 U.S. at 802–07). Both Title VII and ADEA discrimination claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* framework. *See Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020). Retaliation claims based on circumstantial evidence also follow this framework. *See George*, 966 F.3d at 558 (citing *McDonnell Douglas*, 411 U.S. at 802–07).

Assuming Parks established a prima facie case,[5] Defendants produced a legitimate, non-discriminatory reason. (Doc. 124-1, at 30–31; Doc. 124-6, at 5–6.) Defendants' state they refused to place Parks at a TVA facility because they found him untrustworthy following their review of his 2007 arrest with TVA Police and his application for Murray Guard employment. (Doc. 126, at 20.) Because Defendants produced a legitimate, non-discriminatory reason, Parks must provide evidence showing that Defendants' offered reason is pretext for discrimination or retaliation. *See George*, 966 F.3d at 558 (citing *McDonnell Douglas*, 411 U.S. at 802–07). To

---

[5] Defendants do not dispute in their briefing Parks's ability to establish a prima facie case for purposes of their summary-judgment motion. (Doc. 126, at 20.)

establish pretext, Parks can show the reason offered (1) has no basis in fact, (2) did not actually motivate the decision to terminate, or (3) was insufficient to motivate the decision to terminate. *Segel v. Kimberly-Clark Corp.*, 473 F. App'x. 416, 420 (6th Cir. 2012) (citing *Manzer v. Diamond Shamrock*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Here, Parks does not provide evidence suggesting that the proffered reason for his termination is pretext for unlawful discrimination or retaliation; rather, he merely states in conclusory fashion the reason is pretext. (Doc. 134, at 5.) Accordingly, TVA is entitled to summary judgment on Parks's discrimination claims under Title VII and the ADEA. *See Peters*, 285 F.3d at 470 (citing *Reeves*, 530 U.S. at 143).

    b. Hostile Work Environment

To establish a hostile-work-environment claim under Title VII, a plaintiff must show (1) they belonged to a protected group, (2) they were subject to unwelcome harassment, (3) the harassment was based on membership in the protected group, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the employer is liable. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009). Here, only the fourth and fifth elements are at issue.

Harassment is sufficiently severe or pervasive when the conduct "create[s] an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021). "Generally, 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive."

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998)).

In this case, Parks has not submitted evidence creating a genuine issue of material fact as to whether he experienced severe and pervasive harassment. *See Johnson*, 13 F.4th at 505. While Parks alleges Shiflett made racially insensitive comments, these comments were isolated, as Parks alleges these incidents only happened twice, a week apart. *See id.*; (Doc. 124-1, at 51–52, 72; Doc. 124-7, at 1–2.) The incidents were not "of a continual nature." *See Hawkins*, 517 F.3d at 252 (quoting *Abieta*, 159 F.3d at 252). Rather, they were discrete incidents. *See id.*; (Doc. 124-1, at 51–52, 72; Doc. 124-7, 1–2.) While the comments were offensive, due to their limited nature, a reasonable person could not find that the work environment was hostile and abusive based on these comments alone. *See Johnson*, 13 F.4th at 505.[6]

### iii. Whether an Employment Contract Existed upon Which Parks Can Base Breach of Contract Claim and Section 1981 Claims.

A contract entered under authority conferred by a federal statute is governed by federal contract law. *U.S. v. Seckinger*, 397 U.S. 203, 209–10 (1970). TVA is an executive-branch corporate agency. (Doc. 126, at 3.) Therefore, federal contract law applies. *See Seckinger*, 397 U.S. at 209–10. Under federal law, a breach of contract claim requires a plaintiff to establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of

---

[6] Parks also fails to establish that TVA can be held liable. An employer is vicariously liable for harassment committed by a supervisor but is liable for harassment committed by a coworker only if the employer "knew or should have known of the charged [racial] harassment." *Doe v. City of Detroit*, 3 F.4th 294, 301 (6th Cir. 2021) (citing *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005)). A "supervisor" is someone who can take "tangible employment actions" against the victim—someone with the power to hire, fire, promote, transfer, or discipline. *Vance v. Ball State Univ.*, 570 U.S. 421, 424–25 (2013). Because Shiflett was a weekend lead supervisor rather than an on-site supervisor, he was not responsible for discipline. (Doc. 124-1, at 122; Doc. 124-3, at 43.) TVA did not know or have reason to know of the harassment until after Parks was no longer employed by Murray Guard. (Doc. 124-1, at 28–29.)

the contract, (3) a breach of that duty and (4) damages caused by that breach." *Pryor v. U.S.*, 85 Fed. Cl. 97, 104 (Fed. Cl. 2008) (citing *San Carlos Irrigation & Drainage Dist. V. U.S.*, 877 F.2d 957, 959 (Fed. Cir. 1989)). Additionally, 42 U.S.C. § 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts. . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Unlike Title VII and the ADEA, which require an employment relationship, § 1981 has no such employment requirement. *See id.* § 1981(b) ("the term 'make and enforce contracts' includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and condition of the contractual relationship."). However, § 1981 requires a contractual relationship. *Id.*; *Brintley v. St. Mary Mercy Hosp.*, 545 F. App'x. 484, 488 (6th Cir. 2013). So, while a non-employee can bring a claim under § 1981, he must first show the existence of a contract. *See Brintley*, 545 F. App'x. at 488.

In this case, Parks fails to provide evidence suggesting that he entered into a contract with TVA. Parks claims that, on January 9, 2014, he signed a contract between himself, Murray Guard, and TVA. (Doc. 124-1, at 54, 102–05.) While this document was signed by Parks and a representative from Murray Guard, it was not signed by TVA. (Doc. 124-2, at 13.) And it was not a contract for employment, but rather an acknowledgment that Parks had received the employee handbook. (*Id.*) The document specifically stated, "I understand that the [employee] Handbook provides only a general guide and that neither it as a whole or any provision in it constitutes a contract of employment, either express or implied, between Murray Guard and myself." (*Id.*) Under these facts, there is no material dispute as to whether a contract existed. *Sec'y of U.S. Air Force v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir. 2009). There was also no mutuality of intent to contract, because TVA was not a party to the document

between Murray Guard and Parks. *See Sec'y of U.S. Air Force*, 585 F.3d at 900; (Doc. 124-2, at 13.) Additionally, Murray Guard lacked actual authority to represent the government or bind TVA to a contract. *See Sec'y of U.S. Air Force*, 585 F.3d at 900; (Doc. 124-1, at 17.)

Because no contract between Parks and TVA existed, Parks's breach-of-contract and § 1981 claims fail. *See Pryor*, 85 Fed. Cl. at 104; *Brintley*, F. App'x. at 488. Defendants' motion for summary judgment (Doc. 125) on these claims is **GRANTED**.

## II. PARKS'S MOTION TO ALTER ORDER ON DEFENDANTS' JUDGMENT ON THE PLEADINGS

This Court previously granted in part and denied in part Defendants' motion for judgment on the pleadings (Doc. 100). Parks has moved to alter or amend the Court's judgment (Doc. 106). Under Federal Rule of Civil Procedure 59(e), a court may grant a motion to alter or amend when there is: "(1) a clear error of law; (2) newly discovered evidence; an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999)). Because Parks does not raise any of these grounds and rather seeks to re-litigate the order, his motion (Doc. 100) is **DENIED**.

## III. CONCLUSION

For the reasons above, Defendants' motion for summary judgment (Doc. 125) is **GRANTED**. Parks's claims against Defendants will be **DISMISSED WITH PREJUDICE**. Parks's motion to alter the order on Defendants' motion for judgment on the pleadings (Doc. 106) is **DENIED**. Parks's motion to file a second amended complaint (Doc. 111) is **DENIED** as **FUTILE** because the claims he seeks to add are barred by Tennessee's one-year statute of

limitations.[7] *See* Tenn. Code Ann. § 28-3-104. Parks's objection to the magistrate judge's order on Defendants' motion to quash (Doc. 115) is **OVERRULED** because the discovery sought is unreasonably cumulative and duplicative, and Parks had ample opportunity to obtain the information sought through the depositions that were conducted. *See* Fed. R. Civ. P. 26(b)(2)(C). The Court will **DENY** as **MOOT** Parks's motions in limine (Docs. 131, 148) and Defendants' motion in limine (Doc. 150). The Court will **DENY** Parks's motion for sanctions (Doc. 133) because he failed to comply with the procedure set forth in Federal Rule of Civil Procedure 11(c)(2). Defendants' motion to strike supplement and reply to response to motion for summary judgment (Doc. 143) is **GRANTED**. Defendants' motion to strike jury demand (Doc. 152) is **DENIED** as **MOOT**. Plaintiff's motion for leave to include additional witnesses for trial (Doc. 156) is **DENIED** as **MOOT**. Any additional non-dispositive pending motions are **DENIED** as **MOOT**.

        **AN APPROPRIATE JUDGMENT SHALL ENTER.**

                                                  /s/ *Travis R. McDonough*
                                                  **TRAVIS R. MCDONOUGH**
                                                  **UNITED STATES DISTRICT JUDGE**

---

[7] Parks seeks to add various claims under 42 U.S.C. § 1983; 42 U.S.C. § 1985; 42 U.S.C. § 1986; negligence; invasion of privacy; fraud; and negligent and intentional infliction of emotional distress. (Doc. 111, at 23–34.) As discussed in the magistrate judge's report and recommendation to deny Plaintiff's motion to amend the first amended complaint (Doc. 42), Parks's federal-civil-rights claims are barred by a one-year statute of limitations. *See* Tenn. Code Ann. § 28-3-104. Likewise, as discussed in this Court's order granting Defendants' motion for judgment on the pleadings with respect to Parks's state-law tort claims (Doc. 100), tort claims brought by at-will employees against their employers are subject to a one-year statute of limitations in Tennessee. (*Id.* at 10–11); Tenn. Code Ann. § 28-3-104(a)(1).